LEEVER v. CENTRAL CITY LUMBER CO.

EJECTMENT—BOUNDARIES—ALLEY—DESCRIPTION.

Where plaintiffs in ejectment had conveyed to the defendant a parcel of land described as lots 15, 17, and land lying east thereof, bounded on the northwest by Michigan avenue, east by Milwaukee street, formerly Albany street, on the south by Wesley street and on the west by an alley contiguous to lot 17, and no alley appeared in the original plat, as prepared for filing by the owner, and lot 17 did not have the alleged alley but included said land, described by metes and bounds, that the plat had never been filed in the office of the register of deeds and was at an early date lost, the deed from plaintiffs to defendant carried with it all the property purporting to be transferred, including the alleged alley, which did not show upon the premises and which was not in actual use, and which defendant, who had been in possession as tenant, occupied with the rest of the realty; plaintiffs' contention and evidence that because an abstract furnished to defendant after entering into a contract for the purchase of the land, contained a map with parallel lines that they alleged represented the alley across the lot, is *held* to be insufficient to prove title in the grantors who admitted that no open and used alleyway had ever existed on the lot,—no public or private way existing in fact. And a reservation did not result from describing the parcel as bounded on the west by an alley.[1]

Error to Jackson; Parkinson, J.   Submitted October 12, 1915.   (Docket No. 61.)   Decided December 21, 1915.  Rehearing denied June 23, 1916.

Ejectment by Fred O. Leever and another against the Central City Lumber Company.   Judgment for defendant.   Plaintiffs bring error.   Affirmed.

[1]The effect of bounding grant on private way to carry title thereto is discussed in note in 24 L. R. A. (N. S.) 539.

*Grove H. Wolcott,* for appellants.

*Price & Whiting,* for appellee.

The action is ejectment to recover possession of a parcel of land in the city of Jackson, described in the declaration as:

"Commencing at the southeast corner of lot 17 in block 3 south of range 2 east according to Stratton's survey; thence east along the north line of Wesley street 16½ feet; thence north to the south line of Michigan avenue; thence northwesterly along the south line of Michigan avenue to the northeast corner of said lot 17; thence south along the east line of said lot 17 to the place of beginning."

Testimony for plaintiffs tended to prove the following facts: Alonzo Bennett in 1865 acquired title by warranty deed to an undivided one-half and in 1868 to the other undivided one-half of premises described as:

"Commencing at the southwest corner of lot seventeen (17) in block three (3) south, range two (2) east, in the city of Jackson, county of Jackson, State of Michigan; running thence north to Mill street; thence southeasterly on the south line of Mill street to Albany street; thence south on the west line of Albany street to Wesley street; thence west to the place of beginning."

Plaintiffs, as husband and wife, in 1908 took from the heirs of Alonzo Bennett a warranty deed, describing land as follows:

"Lots fifteen (15) and seventeen (17) in block three (3) south, range two (2) east, according to Stratton's survey; also a parcel of land lying east of said lot seventeen (17) bounded on the northeast side by Michigan avenue, formerly Mill street, on the east by Milwaukee street, formerly Albany street, on the south by Wesley street, and on the west by an alley contiguous to lot seventeen (17) aforesaid."

Dated December 15, 1911, a quitclaim deed was executed by the Bennett heirs to plaintiffs conveying:

"Commencing at the southeast corner of lot 17, block 3 south, range 2 east, according to Stratton's survey; thence east along the north line of Wesley street 16½ feet; thence north to the south line of Michigan avenue; thence northwesterly along the south line of Michigan avenue to the northeast corner of said lot 17; thence south along the east line of lot 17 to the place of beginning. The purpose of this conveyance is to grant to the parties of the second part hereto, their heirs and assigns, all right, title, and interest which parties of the first part had in and to the above parcel of land on the 7th day of October, 1908."

Plaintiffs made a lease to defendant, dated June 10, 1908, of lots 15, 17, and 18, and the west half of lot 16, block 3 south, of range 2 east, excepting a small cottage, the lease containing the following stipulation:

"Part of said premises are at present under lease to John Middaugh whose lease of same expires May 1, 1909; * * * The part which said Middaugh occupies being lot 17 and 18. * * *"

Under date October 26, 1911, plaintiff Fred O. Leever acknowledged in writing the receipt from defendant of a sum of money to apply on purchase price of lot 17, lot 15, and the west half of lot 16, with the exception of that part lying west of Michigan Central Railroad track, block 3 south, of range 2 west, city of Jackson, agreeing to furnish an abstract of title and convey by warranty deed. An abstract was furnished, attached to which was a plat or map. The caption to this abstract was—the property abstracted as shown by recital—lots No. 15 and 17 in block 3 south, of range No. 2 east in the city of Jackson according to the recorded plat of the village of Jacksonburg;

"also a parcel of land lying east of above-described land and bounded on the northeast side by Michigan avenue, formerly Mill street, and on the east by Mil-

waukee street, formerly Albany street, and on the south by Wesley street, and on the west by an alley contiguous to lot 17 aforesaid."

The deed executed by plaintiffs to defendant describes lots 15 and 17 and west half of lot 16 (with exception). The premises held by defendant as lessee of plaintiffs had for 20 years or more before this suit was begun been surrounded by a fence. Defendant used them for a lumber yard. The premises were a part of the land surveyed and platted as the village of Jacksonburg by one J. F. Stratton, which plat included the older portion of the city of Jackson and was

made in the year 1830. What purports to be a copy of the Stratton plat is recorded, with an affidavit which recites that the plat was made and deposited in the office of the register of deeds for Washtenaw county for record, was lost before record, and that the annexed plat is a true copy of the original. As shown by this plat as recorded, the premises appear to lie as indicated on the opposite page.

There are maps of the city of Jackson, including the territory platted as the village of Jacksonburg. Names of streets, and perhaps their courses, have been changed. New streets have been laid out. A copy of the plat which was attached to the abstract furnished defendant follows:

It is said in the reply brief of plaintiffs and appellants:

"It is not claimed by the plaintiffs that there ever was an open and used alleyway between lot 17 and the parcel east thereof, but they do insist that the same was represented upon the original survey and referred to in the deed from the Bennett heirs to the plaintiffs, and also in the abstract furnished defendant, and in the caption thereto and in the plat attached to said abstract, and that defendant had full opportunity for knowledge of the situation with regard to such alley and its boundaries at the time the deed was delivered."

Plaintiffs' testimony tended to prove, further, that for the premises, including lot 18, they asked $15,000, and excluding lot 18, $12,000. Defendant paid $12,000 for what it purchased. Plaintiffs' witness Francis D. Bennett testified that he drew the deed from the Bennett heirs to plaintiffs.

"I got that description in that deed from one of those little folding maps I have had for a good many years. I think it was made by Mr. Fargo; one I have had in my desk for a good many years. In that deed we conveyed lot 17 and a description of a parcel which was not numbered as a lot. The parcel with reference to 17 was east of it, separated by a strip 16½ feet. It was an alley. I do not say 16½ feet, but those alleys usually are 16½ feet. There was never any alley at that point designated there open to the public and used during the time I have known the premises. The reason why I omitted the alley in the deed to Leever and wife from the Bennetts in 1908 was because that property had been carried on my father's books as No. 15 and 17 and 18, and I had always supposed that this piece east of lot 17 separated by an alley which showed on my map in that way was lot 18, but when I came to draw this deed I found this was not numbered as No. 18, so I deeded it—described it. My map showed an alley, a continuation in line with the alley which is open from Wesley street south. That map is a Fargo map. It showed an alley across between what my father had

called, I suppose, 17 and 18. I supposed he had no deed for it. I supposed he simply had a deed for lot 17 and what he called 18, so I deeded those two pieces, thinking we had no recorded title to the alley—merely possession. * * * Leever and wife held this property from myself and brothers under contract for some time before they got the deed. During that time they held it under contract they made a lease to the Central City Lumber Company. Myself and my brothers ratified the lease by the writing at the bottom of the lease. In that lease, as well in the contract, that land is referred to as lots 17 and 18. I have no recollection that we had more than one contract with Leever covering that piece of property. The deed of the Bennett heirs, I think, was given in 1908. Mr. Leever and wife went into possession of all that land there under that contract referring to the property as lots 17 and 18, and when the lease was given to the Central City Lumber Company they also went into possession, I believe, of the land under the description of 17 and 18. I knew of their having possession afterwards.

"Q. You intended those descriptions to cover that property, and supposed it had?

"A. No, sir; I don't think I intended it to cover that property. I intended they should have that property, but I didn't understand the description covered the property.

"Q. Were you reserving something, or did you describe the property in such a way you understood you were not describing all of it when you made that contract and lease; is that what you are getting at?

"A. Yes, sir; I did describe. I did not describe all I supposed they were getting.

"Q. I didn't ask you that. I say: Did you, when you used that description, intentionally use a description which you knew did not cover all the property which was understood by the parties to be covered?

"A. I can't say—that isn't—I can't say 'Yes' or 'No' quite to that, Mr. Price. The facts are I intended them to have that property. I supposed my father only had a deed to the lots, and not to the alley, so I simply gave them those two lots, thinking it would carry the alley with it; that those two lots would carry the alley the same as he had; that those two lots would carry

the alley with it, the same as he had. I intended that description to carry the property, but decided not to describe it. It was so used by the parties in the negotiations to carry that property. There was nothing said by me at any time to the Central City Lumber Company or Mr. or Mrs. Leever at the time that contract and lease was made that there was anything to be reserved; that they did not get the whole thing. It was explained to Mr. Leever that he got that alley with those two lots, that I was deeding him the two lots, two separate pieces, and that the alley went with it. We always had possession, and he would get it with it. There was something said to Mr. Leever about the alley. I said that to him. I didn't have any dealing with the officers of the defendant, and said nothing to them. * * * Preceding the giving of the quitclaim deed Mr. Leever came to me. I had my talk and conversation with him entirely at that time, to the best of my knowledge. Pursuant to that myself and my brothers finally gave this quitclaim deed. I negotiated the business for my two brothers. Mrs. Leever did not then take any active part in it according to my recollection."

There was hanging in the office of defendant before and at the time the option was given and the deed to them executed a map of the city of Jackson which showed, as the Fargo map does, an alley extending across lot 17.

For defendant there was testimony tending to prove that there has never been at any time visible evidence of an alley on the east side of lot 17. No one looking at the premises could distinguish the line between lot 17 and the parcel called 18. No mention was made of an alley in the negotiations of plaintiffs and defendant. No officer of the defendant examined the abstract or the plat attached to it. It was submitted to its attorney, Mr. Price, for examination and opinion concerning the title to the land described in the option or receipt. The price asked by plaintiffs for all the land they held, all of it being occupied under lease by defendant, was $15,000, which included $3,000 for lot

18.  Before the option already referred to was drawn, plaintiff Fred O. Leever, but not in the hearing nor immediate presence of his wife, and not with her knowledge, so far as is made to appear, pointed out to the defendant's officers the east line of lot 17, indicating that it was a line in continuation of the east line of the alley on the south side of Wesley street.  In an argument concerning the admissibility of this testimony, counsel for defendant said:

"This is my theory about it, if your honor please: The deed calls for lot 17, block 3 south, range 2 east, referring to no survey at all, Stratton or anybody else. Their theory is that that description means the Stratton survey, or, as they call it, the Packard map.  That is their theory.  That really means lot 17, block 3 south, range 2 east, according to the plan of the village of Jacksonburg by Stratton.  They have got a copy of that in evidence.  We contend it, according to that plan they have got in here, goes clear out to Albany street.  Don't mistake our position about that. We claim that goes clear out to Albany street, even as shown on the map itself, but it was never treated that way by these people.  That is conclusively shown. They have put in a deed here—a lease and other papers there before you now—in which lot 18 is spoken of, which they say never was in the plan of the village of Jacksonburg.  Never having been there, where did it come from?  Our answer to that is this, and it is consistent with our other position:  It never was there.  17 went clear out to Albany street or Milwaukee street, and when they made lot 18 they took part of 17 for 18.  Those two positions are exactly consistent.  They divided 17 because it was a large lot, and they called the east end of it lot 18, and that is why we do not find any 18 on the original survey—no 18 there.  But there is an 18 in the dealings between these parties that we can't get over.  They choose that term in their lease.  It was so on the books of Alonzo Bennett and Mr. Frank Bennett says he doesn't know how it came to be that way, but it was treated that way.  Now, having divided this property and covered the whole thing, and designating it by 17 and 18, they

commence to negotiate about the purchase of all of it. They fixed upon a price of $15,000, that is the price asked. He asked a separate price for lot 18, lot 18 spoken of in their lease, the lease signed by Mrs. Leever, as well as Leever. He asked a separate price of $3,000 for that lot. They think that is too much for that one lot. They had rather take the balance without that than to pay $3,000 for that one lot. So the option was drawn, and they get all of it but lot 18."

At the hearing in this court the book of plats in which the so-called Stratton plat was recorded was produced. An examination of it showed that lot 17 extended east to Albany, now Milwaukee, street. No other plat was introduced in evidence.

OSTRANDER, J. (*after stating the facts*). Defendant has and claims no title except that derived from the plaintiffs. Plaintiffs had title to a parcel of land described as lot 17. This title defendant acquired. What are the dimensions, boundaries, of lot 17? It is clear that Alonzo Bennett, plaintiffs' grantor, had title to all of the land east of the alley, which it is admitted bounds lot 17 on the west. In the deeds running to Mr. Bennett the land is described by its boundaries, not merely as lot 17, and in neither deed is a plat referred to. No testimony tends to prove that any owner opened, laid out, or dedicated an alley crossing lot 17. No such alley was acquired in condemnation proceedings. No testimony tends to prove that a private alley was opened and used, for convenience, across lot 17. There was therefore, in fact, no public or private way east of the west line of lot 17 as described in the conveyances which are in evidence. Apparently it was Mr. Bennett who first divided the original lot 17, not in fact, not by a plat, but by a memorandum which appears to conform to pictures or maps made by others and in common use. He called the east end of lot 17 lot 18; and, when his heirs sold the property in 1908,

the deed executed by them describes both lot 17, and by boundaries, but not by dimensions, a piece of land lying east of lot 17, which, by recital, had an alley for its western boundary. When this deed was executed, the grantees therein, by their tenant, the defendant, had possession of all of the land. Mr. Francis Bennett, who prepared the deed, was mistaken in supposing that his father had no title to the land now claimed to have been an alley. The recital in the deed affected no rights of the grantor or grantees therein, because the grantees had then, by their tenant, the defendant, possession and control of the entire premises. No reservation to the grantor was intended by the recital in the deed that the parcel east of lot 17 was bounded on the west "by an alley contiguous to lot 17." The title to all of the land resting in Mr. Bennett, no reservation as between the parties to the deed resulted. No public right was affected.

As between the plaintiffs and defendant it was understood that lot 17 did not extend so far to the east as Milwaukee street; that there was land east of lot 17, title to which did not pass by the deed. It is unfortunate that the dimensions of the parcel intended to be conveyed as lot 17 were not stated in the deed. No alley was talked about, and the bargain for the purchase and sale of the property was made before an abstract was furnished or examined. There being no alley in fact, it is necessary to consider whether for the purposes of this action, between the parties to the deed which describes and conveys lot 17, there is an alley 16½ feet wide on the east side of lot 17 and between that lot and the parcel called in the lease lot 18. If there is, it is because lot 17, as described, had, to the knowledge of defendant, the dimensions which plaintiffs now assign to it. To establish knowledge, or notice equivalent thereto, the caption to the abstract which was furnished, the plat attached thereto, and the

description in the deed from Alonzo Bennett to plaintiffs are relied upon.

It must be assumed from all of the testimony, because the inferences to be drawn therefrom are necessary ones, that while only a portion of the deeds in the chain of title refer in terms to the Stratton plat, all of them do, in fact, refer to it. This agrees with plaintiffs' contention. Upon the plat is a scale to which, it is asserted, it is drawn. According to this scale, the dimension of lot 17 on Wesley street is about 193 to 195 feet. It is about 1⅝ inches on the plat. According to the Fargo map, so-called, purporting to be drawn to the same scale, this dimension of lot 17 is said to be 132 feet, excluding the alley and lot 18. It shows no lot 18. But Fargo's map shows the alley, which never existed in fact. No authority is proven in him to make such a map as he made. It does not delineate what, in fact, existed there. The testimony is conclusive that none of defendant's agents examined the plat attached to the abstract. The attorney who examined the abstract was of opinion that plaintiffs had title to lot 17, and looked no further.

At the most, therefore, the notice which defendant had from the descriptions in the chain of title was that Mr. Bennett, in deeding to plaintiffs, recited as a boundary for the west side of the parcel east of lot 17 an alley. Its dimensions, its location, and its character are not given. The fact that Mr. Leever pointed out to defendant the eastern boundary of lot 17 cannot be used to affect the title of Mrs. Leever. She conveyed lot 17, and is not bound in this action by what her husband, without her knowledge, may have said as to its dimensions or boundaries.

I conclude that plaintiffs have not proven title in themselves to the land in dispute, have not established the fact that the land is not a part of lot 17, and that the court should so have advised the jury. It is sug-

gested whether, upon plaintiffs' theory, a reformation of the deed they gave to defendant is not essential to the establishment of their alleged rights.

Judgment is affirmed.

BROOKE, C. J., and PERSON, KUHN, STONE, BIRD, MOORE, and STEERE, JJ., concurred.